LELIA WESTCOTT, appellant,

*v.*

HANNAH W. SHEPPARD et al., respondents.

1. A testator who can comprehend the property he is about to dispose of by will, the natural objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the other and the disposition which his will makes, at the time of executing the will, possesses testamentary capacity.

2. The influence which the law denominates undue, and which vitiates a will executed under it, must amount to moral or physical coercion, destroying free agency and constraining its subject to do that which but for it he would not do.

On appeal from a decree of the prerogative court, reversing a decree of the Camden county orphans court.

*Mr. Christopher A. Bergen,* for the appellant.

*Mr. Thomas B. Harned* and *Mr. David J. Pancoast,* for the respondents.

The ordinary delivered the following opinion:

The decree now reviewed determines that a paper which was admitted to probate on the 15th day of August, 1889, by the surrogate of Camden county, as the will of Thomas D. Westcott, deceased, is not such will, and that the probate of the surrogate be set aside.

This appeal is heard upon the same proofs that were produced and considered in the orphans court.

The validity of the alleged will is assailed by the only daughter of the decedent, upon the grounds—*first,* that the deceased lacked testamentary capacity when it was executed, and, *second,* that he was unduly influenced by the appellant Hannah W. Sheppard.

When the will was executed, Thomas D. Westcott was about fifty years of age. It is undisputed that for two or three years before then he had been a paralytic, and very dependent upon the assistance of others for his physical comforts. He had married in the year 1872, but in 1879 or 1880 he went to Missouri, where, in 1882, he procured a divorce from his first wife, upon the allegation that she had deserted him. In 1884 his wife likewise obtained a divorce from him in this state on similar grounds. He had one child, a daughter, the respondent in this appeal, who is not yet of full age. Since the separation of her parents, this daughter has lived with her mother, and has only occasionally visited her father, and then only for a short time. In his early manhood the decedent studied medicine, and although he failed to secure a diploma from a medical college, he practiced for a time under an unrecognized diploma that he had purchased. His ability and attainments were so far acknowledged by his fellow-practitioners that he was regularly admitted to membership in a medical society in Camden, and for a time, until the character of his diploma was discovered, he appears to have maintained a respectable standing in that society. After the worthless character of the diploma became known he resigned from the society and ceased to practice as a physician, yet throughout his life he retained the appellation "doctor," and was known as Doctor Westcott. As long as his parents lived he resided with them. When he married he took his wife to his father's house in Camden, and there lived with her and his parents until his departure for Missouri.

While he was in Missouri his mother's health failed so that she became unable to superintend her household affairs, and needed the constant attention of a nurse. To meet the emergency thus occasioned, the appellant Hannah W. Sheppard, an unmarried niece of the decedent's father, Ebenezer Westcott, being then about thirty-four or thirty-five years of age, and residing in Trenton with her mother, was sent for and installed in the house at Camden as housekeeper and nurse. She served faithfully in this capacity without compensation, being accorded a place as a member of the family. In 1883 Mrs. Westcott, the mother,

Westcott v. Sheppard.

died, and the decedent, Doctor Westcott, returned to Camden and took up his residence with his father.  Miss Sheppard remained and managed the housekeeping.  In January, 1887, Doctor Westcott was stricken with paralysis, and later his father's health began to fail, and both he ·and his father became more or less dependent upon the ministrations of Miss Sheppard.  Doctor Westcott was afflicted not only with paralysis, which affected his left side and palsied his hands, but also with sudden fits of unconsciousness, epileptic in character.  He became physically so helpless that he was usually unable to feed himself, or to dress or undress himself, and in other particulars care for his person. With the knowledge and consent of his father, Miss Sheppard became his nurse.  She attended him by night and · by day, dressed him, fed him and was constantly on the alert lest he should be taken in a fit when no one was present.  She appears · to have performed every office for him, even that which would have been more fittingly performed by a male.

She at the same time cared for the comfort of her uncle, rendering to him most faithful and attentive service.

. It was not considered·that Doctor Westcott would survive his father, but it so happened that his father died intestate in June, 1888, leaving a considerable estate, which went to his son.  The value of the estate has not been shown.  It appears, however, to have been · sufficient to afford an inexpensive but comfortable livelihood for the doctor.

Immediately after his father's death Doctor Westcott conveyed a house and lot on Third street, in Camden, to satisfy Miss Sheppard for the services she had rendered to his father and mother. He appears to have anticipated that she would make a claim upon the father's estate and to have taken this means of precluding it.  The property conveyed to her was worth about $3,500, and was encumbered by a mortgage for $3,000, which the doctor agreed to satisfy.

After the death of Ebenezer Westcott Miss Sheppard remained with the doctor, caring for him and keeping house for him as she had previously done.  Within a short time they moved from the father's house, in Market street, to a smaller rented house in,

Fourth street, leasing the Market street property, and they continued to reside in the Fourth street house until Doctor Westcott died, on the 4th of August, 1889.

The disputed will was executed on the 11th day of January, 1889, at the law office of Marmaduke B. Taylor, in Camden, in the presence of Mr. Taylor, John F. Harned and George H. Peirce. The will is in the handwriting of Mr. Taylor. It directs that the mortgage upon the property conveyed to Miss Sheppard shall be satisfied; that $5,000 shall be invested and the income therefrom paid to the doctor's daughter, Lelia, until the death of her mother, and upon that date, if Lelia shall have reached her majority, the principal is to be paid to her, but if she shall die before her mother the principal shall go into the residue of the doctor's estate. The remainder of the property is divided equally. One-half of it is given to Miss Sheppard and the other half is given to the executors of the will, in trust, to hold the same and to receive and accumulate the income therefrom until the death of the doctor's wife, when the principal and accumulations of income are to be paid to Lelia. If Lelia does not survive her mother, her share in such residue is to go to the testator's aunt, Harriet Sheppard, the mother of Hannah W. Sheppard. The executors named are Charles G. Hampton and Marmaduke B. Taylor, the latter of whom is now dead.

The will exhibits a consideration of the natural claim of the testator's daughter upon his bounty, and partly to the divorced wife, and fear of and desire to guard against the possibility of her benefiting from his estate, and, as well, a sense of indebtedness or gratitude to the cousin who had so faithfully served him. It appears to be the logical sequence of his life and situation.

I have had no difficulty in arriving at the conclusion that Doctor Westcott possessed sufficient capacity to make this will. Without doubt his enfeebled condition of body in some degree affected his mind, and his intellectual vigor was to some extent impaired, but I am abundantly satisfied that whatever the mental impairment may have been, it was not sufficient to destroy testamentary capacity within the well-defined limits laid down by

the adjudications in this state.  When the will was executed the doctor could certainly comprehend his property, the natural objects of his bounty, the meaning of the business in which he was engaged, the relation of each of these factors to the other and the disposition which his will made.

The most important evidence upon this point is that of the attesting witnesses to the will, who speak as to his condition at the very moment of the execution of that document.  They are both lawyers in active practice and in good repute in their profession, being justly esteemed to be men of unquestionable probity. They had both been students in Mr. Taylor's office and had both for several years known Doctor Westcott.  At the time the will was executed they conversed with him for several minutes and became entirely satisfied that he fully appreciated and understood the business in which he was engaged.

The testimony of nearly all the witnesses who are relied upon to show incapacity, while it exhibits infirmity of body and evidence of some abatement in intellectual vigor, abounds in that which evinces a sufficient testamentary capacity.  I find among the exhibits a letter, which the doctor wrote to his daughter on the 7th of September, 1888, four months before the will was made, which is most accurately and clearly expressed and in good handwriting.  It is shown that later in the month in which this letter was written that he negotiated a lease of a portion of his Market street property to a political club, and acted in that transaction in an intelligent and business-like manner, and thereafter, until the very month of his death and for six months after the execution of the disputed will, personally collected the rent secured by the lease and properly receipted in writing for it as the several monthly payments were made.  Some sixty-two checks drawn after November, 1888, most of them filled out with his own hand and all of them signed by him, also evince capacity.  Besides, the weight of the testimony of those witnesses who saw and conversed with him is in the same direction. Indeed, save in one particular, which is testified to by a discharged servant, that one time he put on three overcoats without being conscious thereof, his whole conduct accords with testa-

mentary capacity. In that particular the servant is contradicted by the testimony of Miss Sheppard.

Passing to the second branch of the case, in which it is insisted that the will was the product of undue influence exercised by Hannah W. Sheppard, the mental condition of the testator is again the subject of inquiry, not for the purpose of measuring testamentary capacity, but for the purpose of ascertaining what his power of self-assertion and self-reliance was, and how far he was able to control his judgment and exercise his will under the influences by which he may have been surrounded.

The influence which is said by the law to be undue, and therefore to vitiate a will or a document executed under it, must amount to moral or physical coercion which destroys free agency and constrains its subject to do that which but for it he would not have done. If influence be brought to bear upon a testator, his mental condition, so far as it affects his will power, is always a matter of inquiry, because, as I had occasion to remark in *Elkinton* v. *Brick, 17 Stew. Eq. 154, 166,* " It is impossible to distinguish, by a fixed rule, between acts which are the bounds of legitimate influence and acts which make the influence undue. Similar acts may be trifling and of no importance in the case of one person, and over-mastering in the case of another. Their effect must depend upon the relation between the parties, the character, strength and condition of each."

I am satisfied by the proofs that Miss Sheppard desired to be well compensated for her services to the doctor, in his will, and that she so told him. The proofs most strongly indicate that it was her wish to take his entire estate, to the exclusion of his daughter. Her position gave her every opportunity to advantageously advance her claims and to subject the doctor to fraudulent contrivance or to excessive importunity. Such importunity may amount to coercion. *Trumbull* v. *Gibbons, 2 Zab. 117; Hughes* v. *Murtha, 5 Stew. Eq. 288; Elkinton* v. *Brick, supra.*

But for the testimony of Mrs. Adelaide Ludlam, a witness produced for the respondent here, it would be difficult to say to what conclusion the conflicting testimony and the presumptions and inferences from situations and acts, which are urged as

*indicia* of undue influence, would lead me.   Happily, however, the testimony of that witness discloses the mental condition of both the testator and Miss Sheppard at the very time when the disputed will was made.   She states that about the 1st of January, 1889, Doctor Westcott told her that he intended to make a will, and that after he said this Miss Sheppard declared that she would see Mr. Taylor, who was to draw the will, and have him prepare it as she desired.   Still later the witness said to Miss Sheppard :  " How did you make out on the influence business ? " to which Miss Sheppard replied :  " Oh, I couldn't do anything with him."

The witness further states that after the will was drawn Miss Sheppard said to her :  " Doc. has got his will home from Marmaduke Taylor's, and he read it over and I read it over, and passed it back to him ; and he asked me what I thought of it, and I said, ' It don't suit me,' and he got very angry."   The witness says that she then asked Miss Sheppard why the will did not suit her, and that Miss Sheppard replied that it was because the property was divided between her and Lelia, when she wanted it all.   The witness said that she had no right to it all, and Miss Sheppard replied :  " You will see that I will get it if he only lives long enough, and if I don't get it in that way I will get it in another."   The witness asked how she could get it, and she replied :  " I am bound to get a deed for that Market street house ; if his life is spared long enough I will get it."   At another time she told the witness that of right the whole estate should go to her for the services that she had rendered to the doctor.   The same witness says that Doctor Westcott came to her after the will was made and told her that he had made it, but that it did not suit him. She says that he told her that Miss Sheppard would not let him make it to suit him ; that she wanted the whole estate, but that he had given her only half of it.   Miss Sheppard contradicts the statements of this witness so far as they apply to her, but assuming the testimony of the witness to be true, and the respondent who offers it cannot complain of such assumption, what is its effect?   It shows that Miss Sheppard claimed the whole estate from the doctor as compensation for her services ;

that the doctor would not give it to her; that without her assistance he went to Mr. Taylor and made a will that did not conform to her wishes, although to a limited extent it recognized the claim she urged upon him. That her claim for compensation was a just one cannot be questioned. She had sacrificed years of her life for the doctor's comfort, and had performed menial and most debasing and disgusting offices for him. It must have been patent to his mind, and to the mind of counsel who advised him and who was advised of Miss Sheppard's claim, that if there should not be a liberal bequest to her, her demand for substantial payment would have favorable consideration in a court of justice. Not only was his estate in peril from her demand after his death, but if she was entirely ignored in the will she might leave him. He may not have wished to give her as large a portion of his estate as he did, but a prudent discretion and business-like judgment may have overruled his inclination and led him to propitiate her by a substantial bequest. However this may have been, his denial of her wish and the subsequent exhibition of his will to her, publishing that denial, shows a determined accomplishment of his own purpose and a freedom from fear and its attendant subserviency, and her boast that she would yet achieve her baffled purpose, is itself an admission that then his will, not hers, was dominant. The testimony of Charles G. Hampton that, on the 3d of August, 1889, when the testator was dying, Miss Sheppard asked if it was too late for her to obtain a deed for the Market street property, impresses me that, after the will was made and until the last sickness, Miss Sheppard never found opportunity to control the doctor's will.

It is true that this evidence shows that Doctor Westcott was constrained to give Miss Sheppard more than he wished, but it is to be remembered that he was not bestowing mere bounty. He was doing justice, settling a claim against him and securing further service. It was the legitimate influence of value, and not undue influence of inexcusable moral or physical coercion, that controlled his action.

The testimony of Mrs. Ludlam and of the subscribing witnesses, together with the provisions of the will, which were consonant with his feelings and surroundings, convinces me that the disputed instrument was his free act and not the product of undue influence.

I think the will was properly admitted to probate, and I will therefore reverse the decree of the orphans court.

PER CURIAM.

Decree affirmed, for the reasons given by the ordinary.

For affirmance—THE CHIEF-JUSTICE, DEPUE, DIXON, LIPPINCOTT, MAGIE, VAN SYCKEL, BROWN, CLEMENT, KRUEGER —9.

For reversal—ABBETT, REED, BOGERT, SMITH—4.